*J. A. Magoon and J. Lightfoot* for defendant.

---

# THE TERRITORY OF HAWAII *v.* WONG SHUI KING.

EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED NOVEMBER 20, 1902.     DECIDED MARCH 17, 1903.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

On appeal from a conviction by a District Court of the offense of libel in the second degree, the defendant moved in the Circuit Court, before trial, for a discharge for the want of a sufficient complaint. The alleged libellous article was set out in the complaint with certain innuendoes. A part of the language of the article was admittedly libellous *per se.* Held, that the motion was properly denied, even assuming that the remainder of the language used was libellous only when read in the light of extrinsic facts and that there were no sufficient averments of such extrinsic facts and no *colloquia* connecting the language with such facts.

The article named the person libelled by his proper name. Held, that the allegation in the complaint that the alleged libellous language was used of and concerning the complainant was a sufficient *colloquium*.

In a prosecution for libel under Chapter 32 of the Penal Laws it is not a ground for discharge that no witness other than the complainant testified that he understood that the alleged libellous language was used of and concerning the complainant. That fact, if essential to be proved, may be found by the jury from other evidence.

Held, that in this case there was testimony of witnesses other than the complainant as well as other evidence sufficient to support a finding that the article in question was understood by those who read it and who knew the complainant and the circumstances surrounding him as referring to him.

OPINION OF THE COURT BY PERRY, J.

(Galbraith, J., dissenting.)

In the District Court of Honolulu, the following charge was entered against the defendant and two others:

"Poon Kwai Leung, of Honolulu, Island of Oahu, being duly sworn says:

"That Wong Shui King, Sze To Yook and Won Kow, being persons of envious and evil and wicked mind, maliciously, wickedly and unlawfully contriving and intending to injure, oppress and vilify one Poon Kwai Leung, this affiant, and to bring him into contempt, scandal, infamy and disgrace, on the 23rd day of September, in the year of our Lord, nineteen hundred and one, at Honolulu, in the Island of Oahu, in the Territory of Hawaii, did falsely and maliciously print and publish and cause and procure to be printed and published in a certain newspaper then and there printed and published in the Chinese language, called the Sun Chung Kwock Bo, a certain false, scandalous, malicious and defamatory libel, containing divers false, scandalous, malicious and defamatory matters of and concerning the said Poon Kwai Leung, according to the tenor following: " (Here is inserted a copy of the alleged libellous language in Chinese) "which being translated into the English language

were and are the same signification and meaning as the English words following:

" 'At the present time men's minds are not as they were in ancient times. But as a snake tries to devour an elephant it cannot compare with Poon Kwai Leung (meaning that said Poon Kwai Leung, this affiant, is not as honest as the men of ancient times and that said Poon Kwai Leung, this affiiant, is endeavoring to gorge himself and fill his, said Poon Kwai Leung's, pockets with other people's money in a dishonest, fraudulent and reprehensible manner). Why is this? I will now narrate about this person (meaning said Poon Kwai Leung, this affiant) so that the numerous friends (meaning the Chinese people) and virtuous men can judge whether it is accordingly, or otherwise. This person (meaning Poon Kwai Leung, this affiant) has not been in Honolulu very long and depending on the support of Consul Yang (meaning Yang Wei Pin, His Imperial Chinese Majesty's Consul at Honolulu) was nominated to attend to the claims of various friends in this city (meaning that the said Poon Kwai Leung, this affiant, had been appointed by said Yang Wei Pin, as such Consul, to prepare and attend to claims for losses sustained by Chinese residents of Honolulu, aforesaid, by reason of certain fires originated and started by and under the order and authority of the Board of Health, in suppressing the alleged bubonic plague, during the months of November and December, A. D. 1899, and the months of January, February, March and April, A. D. 1900, before the Fire Claims Commission of the Territory of Hawaii). This is just the same as 'He has prepared a sword to slay people before he has ascended the throne,' exactly as what was done by Mew Chin and Lau Ching Yin (meaning that Poon Kwai Leung, this affiant, had, previous to his appointment by the said Yang Wei Pin, Consul as aforesaid, intended and designed to swindle and defraud the claimants for losses sustained by reason of the fires originated and started as aforesaid.

" 'But as regards the cases which have been heard in the near past (meaning such claims for losses sustained by reason of the

fires originated and started as aforesaid which have been recently heard by said Fire Claims Commission) some of the various friends (meaning the Chinese people) may have been in the country towns and some at Ewa, Waianae, Waialua and Koolau, and when they heard of the hearing they strove to get first for fear that they would be left behind and came to the city to wait for the hearing.

" 'But unexpectedly he (meaning Poon Kwai Leung, this affiant) was only taking care to fill his (meaning Poon Kwai Leung's, this affiant's) pocket. Those (meaning such claimants) who gave him (meaning Poon Kwai Leung, this affiant) money, were summoned to be heard very quickly and those (meaning such claimants) who had no money to give him (meaning Poon Kwai Leung, this affiant) were delayed for a long time, simply seeking to waste their time (meaning to charge thereby and did charge thereby that Poon Kwai Leung, this affiant, was guilty of bribery and of accepting bribes to advance and expedite the hearing and consideration of causes before a court of record of the Territory of Hawaii.)

" 'In my opinion Consul Yang (meaning said Yang Wei Pin) has fleshy eyes without eyeballs (meaning that said Yang Wei Pin was sightless and blind and without judgment) to appoint this man (meaning Poon Kwai Leung, this affiant) to attend to this matter (meaning the claims for losses aforesaid) and thus waste the time of all friends (meaning the Chinese people).

" 'Besides he (meaning Poon Kwai Leung, this affiant) receives a salary of two hundred dollars per month. What ability has this man (meaning Poon Kwai Leung, this affiant) to receive such a salary? If you inquire into this person's (meaning Poon Kwai Leung's, this affiant's) ability there are in this city innumerable persons with such ability (meaning to charge thereby and did charge thereby that this affiant, Poon Kwai Leung, was incompetent and incapable of filling the position to which he had been appointed by said Yang Wei Pin).

" 'But in attending to this matter if he (meaning Poon Kwai Leung, this affiant) acted honestly, the claimants would be satis-

fied if he (meaning Poon Kwai Leung, this affiant) received even a little more than two hundred dollars salary (meaning to charge thereby and did charge thereby that said Poon Kwai Leung, this affiant, was dishonest and fraudulent and had dishonestly and fraudulently obtained a large sum of money from said claimants in addition to the salary which was paid to him by said Yang Wei Pin for his services).

" 'As regards this man's (meaning Poon Kwai Leung's, this affiant's) conduct, I do not blame Wong, Fong and Ng for stating in their article published heretofore that he (meaning Poon Kwai Leung, this affiant) is one of those who have unconscientious hearts and one of a class that blackmails peoples by false representations.

" 'I hope that friends (meaning the Chinese people) who have fire claims will be on the alert and bear in mind not to enter his (meaning Poon Kwai Leung's, this affiant's) trap.

" 'I purposely publish this for public information.

" 'Dated this 2nd day of September, A. D. 1901.

Yours truly,

WON KOW, Writer.'

"Which said false, scandalous, malicious and defamatory libel the said Wong Shui King, Sze To Yook and Won Kow did then publish to the great damage, scandal and disgrace of the said Poon Kwai Leung, this affiant, contrary to the form, force and effect of the statute in such cases made and provided and against the peace and dignity of the people of the Territory of Hawaii."

The defendant was convicted of the offense of libel in the second degree and sentenced. From the judgment of the District Court an appeal was taken to the Circuit Court of the First Circuit. The jury also rendered a verdict of guilty of libel in the second degree. During the course of the proceedings had in the Circuit Court a number of exceptions were noted by the defendant and later incorporated into a bill, but of these four only are now relied upon. They are, (1) to the denial of a

motion to discharge for want of a sufficient complaint, which motion was presented before the trial, (2) to the denial of a motion, made at the close of the case for the prosecution, "that non-suit be entered on the ground that there has been no proof of the innuendo laid in the complaint connecting the complaining witness with the publication complained of, (3) to the verdict, as being contrary to the law and the evidence and the weight of the evidence, and (4) to the overruling of a motion for a new trial based on the same alleged errors. In support of the motion to discharge it is argued that the language complained of, with but one exception is not libellous *per se* but becomes libellous only when read in the light of extrinsic facts, that the charge contains neither averments of such extrinsic facts nor *colloquia* connecting the words used with such facts, and that the innuendoes alone cannot add to the meaning of the language in question. Whatever the law may be on this subject,—much of it would seem to have been settled in the case of *Prov. Gov't. v. Smith*, 9 Haw. 257—the fact remains that, as conceded by counsel for the defendant, a part of the language complained of (this is the exception just referred to) is in itself libellous. "As regards this man's conduct, I do not blame Wong, Fong and Ng for stating in their article published heretofore that he is one of those who have unconscientious hearts and one of a class that blackmails peoples by false representations." These words are unambiguous. There is no room for construction. Neither averments of extrinsic facts nor *colloquia* are needed to make their meaning plain. They are within the statutory definition of a libel (Section 299, Penal Laws), for they are such as, if false, directly tend to injure the fame, reputation and good name of another person and to bring him into disgrace, abhorence, odium, contempt or ridicule, or to cause him to be excluded from society."

It is further contended with reference to the last quoted portion of the article that the charge contains no averment or *colloquium* showing that the words apply to the Poon Kwai Leung who is the complainant, and also that it does not appear from the article itself whether "this man" who is said to be "one

of a class that blackmails" refers to the Poon Kwai Leung therein mentioned or to "Consul Yang." Taking this last contention first and assuming (the view most favorable for the defendant) that this question of construction was one to be finally determined by the jury, we can simply say that the words "this man" as used in the article are at least capable of the construction that they refer to Poon Kwai Leung and not to Consul Yang. As to the other, the charge does, in our opinion, sufficiently set forth that the complainant is the one of whom the alleged libellous words were used. See *Miller v. Parish,* 8 Pick. 383, 385; *Hanson v. Globe Newspaper Co.,* 159 Mass. 293, 296. The complaint is in part as follows: "Poon Kwai Leung, of Honolulu, Island of Oahu, * * * says: that Wong Shui King * * * maliciously * * * intending to injure, oppress and vilify one Poon Kwai Leung, this affiant, and to bring him into contempt, * * * did maliciously print and publish * * * a certain false * * * libel, containing divers false, scandalous, malicious and defamatory matters of and concerning the said Poon Kwai Leung, according to the tenor following: * * * which said * * * libel the said * * * did then publish to the great damage, scandal and disgrace of the said Poon Kwai Leung, this affiant." The *colloquium* is in the technical phrase often employed, "of and concerning." The allegation is of the fact; the evidence supporting the allegation need not be recited in the complaint.

The technical objection to the motion for non-suit, that such a motion cannot properly be made in a criminal case, need not be passed upon. What has been said on the first point concerning averments and *colloquia* to show the libellous meaning of those portions of the article which might otherwise be deemed ambiguous or not libellous on their face, applies equally to this branch of the case. The only other points made by counsel are that no evidence was adduced tending to show that any person other than the complainant read the alleged libellous language and understood it to refer to the complainant and that the evidence adduced was insufficient to support a finding that the language was used of and concerning the plaintiff.

There was ample evidence tending to show that at the date in question the newspaper "Sun Chung Kwock Bo" was one of general circulation in Honolulu and on the other islands and that in its regular issue of that date the article complained of appeared.

The complainant testified that he was the Poon Kwai Leung referred to in the article. He also gave testimony tending to show that at the date of the publication he was interpreter and translator for the Chinese Consul in Honolulu, that prior to that time he had been appointed "to take charge of the Chinese Fire Claims," that about 2668 of said claims had been presented to him, that for about 26 days he had been engaged in preparing such claims for the claimants, and that his salary for a part of the time was $200 a month. The portion of the article translated in the complaint as meaning "the claims" (of various friends) was testified to by some of the witnesses for the prosecution as meaning "the fire claims." We think that there was sufficient evidence to support the finding of the jury that the Poon Kwai Leung referred to in the article was the complainant.

It is immaterial that those who did not know the plaintiff did not understand that the libel referred to him. Whether or not those who did know him, his occupation and other circumstances surrounding him and who read the article, would so understand it, is a question of fact to be determined by the jury, but for its determination the direct testimony of those who read it is not essential. Other evidence may suffice for the purpose. Where, as in this case, the person libelled is referred to by his proper name and his occupation and salary are stated, and evidence is given by the complainant of facts tending to show that such description applies to him, a finding by the jury that the article did refer to him and that it would naturally be so understood by those who knew him, can not be set aside as being contrary to the evidence. In such a case, the elements of the statutory offense that the words must be such as "directly tend to injure" the complainant's fame and good name "and to bring him into contempt" and that the publishing of a libel

is the maliciously putting of it into circulation "and thereby in fact making it known to others," are sufficiently proven.

Moreover, can it be correctly said that no witness other than the complainant testified that he had read the article and that he understood it to refer to the complainant? Choo Ho, the editor of a Chinese newspaper, after testifying that he had received, as usual, a copy of defendant's paper of September 23, 1901, in exchange, was asked: "Now was there any article in this issue that you saw at that time, about Poon Kwai Leung?" to which he answered, "Yes, Sir." He then proceeded to translate the article in question, and after concluding was asked by counsel for defendant, "Is what is said in that article true?" A. "Yes, Sir." Q., on re-direct: "Did you mean to testify that the article about Poon Kwai Leung was true?" A. "Yes, Sir." Q. "Are the matters and statements in that paper true?" A. "No." Yet Kai, editor of a Chinese newspaper, was thus examined: Q. "Do you get copies" (of the Sun Chung Kwock Bo) "in exchange for that of your paper?" A. "Yes, Sir." Q. "On Sept. 23, 1901, did you get copies of that?" A. "Yes, Sir. I have kept that." Q. "Do you remember if there was any article in the paper about Poon Kwai Leung?" A. "Yes, Sir." Lin Chin Chow, another witness for the prosecution, answered in the affirmative the question, "Do you remember seeing in it" (the Sun Chung Kwock Bo of Sept. 23, 1901) "an article about Poon Kwai Leung?"

The foregoing testimony, while capable of the construction that the witnesses understood by the words Poon Kwai Leung simply the Poon Kwai Leung mentioned in the article irrespective of any thought as to the particular individual intended, is nevertheless, in view particularly of the fact that the complainant was present at the trial, also capable of the construction that in the use of that name, in the questions put, reference was being made to the Poon Kwai Leung who was present in court and that the witnesses so understood the questions and answered accordingly. The interpretation of testimony is under such circumstances a matter to be passed upon by the jury, and if in this case the jury understood the witnesses named as testifying that

in the issue of the paper in question they had read an article relating to Poon Kwai Leung, the complainant, and that article was subsequently identified as the one complained of, we cannot say that the jury erred.

The motion for a new trial presents no other questions which are relied upon.

The exceptions are overruled.

*W. Austin Whiting and Andrews & Andrade* assisting the prosecution.

*Kinney, Ballou & McClanahan* for defendant.

### DISSENTING OPINION OF GALBRAITH, J.

In the consideration of this case I have not been able to close my eyes to the fact, so patent on the record, that the prosecution primarily grew out of and is pressed by a feud between two rival Chinese Societies. I am not willing to dignify "the English as she is wrote" by American Chinese by holding that the publication of the ambiguous, symbolical and ungrammatical nonsense set out in the complaint constitutes a crime under the laws of this Territory and to affirm a sentence of *thirty days at hard labor* against the defendant for publishing the same.

The record bristles with evidence pointing to the conclusion that the strong arm of the criminal law was not invoked in this instance to redress a wrong against society, to restrain the enemy of private morals or private virtue, but to humiliate, harass and oppress a personal enemy. Under such circumstances, it seems to me, that an appellate court, at least, should scrutinize the record with extreme care, and ought to resolve every reasonable doubt in favor of the liberty of the subject.

The alleged libel was written by a room boy at a local hotel and given to his friend, the defendant, who is manager of a Chinese newspaper, the organ of the Bow Wong Society. The article was published in Chinese characters at advertising rates. The prosecuting witness is a member of the Consul's party.

To constitute the offense of criminal libel under the statute of this Territory the publication in writing, print or character,

etc., must, if false, "directly tend to injure the fame, reputation and good name of another person, and to bring him into disgrace, abhorence, odium, hatred, contempt or ridicule, or to cause him to be excluded from society." Before the thing written or printed and published can "directly tend to injure the fame," etc., of any person it must convey a definite meaning and be capable of being understood by those versed in the writing, signs or characters in which it is given. It is scarcely necessary to cite authorities to establish the propostoin that if the writing, sign or character in which the alleged libellous matter cannot be predicated upon it. It must speak in one language and convey one and the same idea to the initiated in the language. employed.
plcyed.

Applying this test to the publication in question the charge of criminal libel cannot be sustained. The Chinese characters used in the publication did not have a definite and understood meaning even to experts in the language. Five witnesses for the prosecution testified that they were competent Chinese and English scholars and could correctly translate from Chinese into English and no two of these translations are the same. Four of these witnesses translated the heading of the publication and each makes it read different from the other. See Yet Kai says that it should be translated, "Things are not just." Lin Chin Chow says: "Seeing things not fair." Li Cheung (the official court interpreter) says "Taking part of the injured." While Poon Quai Leong, the prosecuting witness, says, "Seeing matters are not just." The translations of the body of the article is given by five witnesses and no two of them give the same translation or exactly agree with that given in the complaint. This difference is clearly illustrated in the several translations of the only part of the publication that is alleged to be libellous *per se.* Cho Ho, the first witness who qualifies as an expert translator, gives it as follows:

"I do not blame them for having argument with him and stating he does his work dishonestly and accusing people of certain things. I do not blame Wong for having argued about this

matter stating that he has no mercy or pity, man without conscience."

The second witness See Yet Kai gives it thus:

"Three men by the name of Wong, Fong and Ng published in the paper some time ago that he has no conscience to force people by misrepresentation. The thing was not so and the man was forced to say it was so, and so this Wong, Kwong and Ng has known him before, and I hope that all friends will look out for to enter his trap, so I tell you all about this."

While Liu Chin Chow, swears that it should be translated thus:

"In regard to this man's conduct I do not blame Wong, Fong and Ng in writing argument, stating that he is one of those who have no conscience and one of those who extorts by force, and falsely accuses people. That is can be seen that Wong, Fong and Ng had experience to forsee this. I hope friends who had claims be careful and keep this in mind and not to enter his trap."

The fourth witness Li Cheung translates it in this way:

"In regard to this man's character I do not blame Wong, Fong and Ng for stating in their article heretofore that he is one of those, who has no conscientious heart and of the heart who blackmail."

And the prosecuting witness makes it read in English thus:

"But as regards this man's character or conduct I do not blame Wong, Fong and Ng for stating in their written article that he is one of those who has unconscientious hearts and one of those who blackmails people by false representations. From this it can be seen that brothers Wong, Fong and Ng can clearly forsee this. I hope that friends who have claims will bear in mind and be on the alert not to enter his trap."

Not one of these several translations agrees in every particular with that set out in the complaint and each one varies more or less from the others. From these facts the conclusion is inevitable that to each of the witnesses who read the publication it spoke a different story. How can any court find, as a matter of law, that characters capable of so many different translations

and whose meaning is so uncertain can be the subject of criminal libel? I do not believe that any court ought so to find.

If the Circuit Judge overruled the motion for non-suit made at the close of the prosecution's evidence on the ground that that was not a proper motion in a criminal case, I am inclined to agree with him and concur with the majority in overrulng the exception taken thereto. However, the exception to the overruling the motion for a new trial ought to be sustained, the verdict set aside and the defendant discharged.